# In the United States Court of Federal Claims

No. 09-640
Filed: March 30, 2016

**********************************************
* 
* 
ROXANN J. FRANKLIN MASON,                         *
* 
     Plaintiff,                                  *       28 U.S.C. § 1491,
*           (Tucker Act Jurisdiction);
v.                                                *       Rule 56 of the United States
*           Court of Federal Claims,
THE UNITED STATES,                                *           (Summary Judgment).
* 
     Defendant.                                  *
* 
* 
**********************************************

**Lisa Alexis Jones**, Lisa Alexis Jones, PLLC, New York, New York, Counsel for Plaintiff.

**Shelley Dawn Weger**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

### MEMORANDUM OPINION AND FINAL ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

**BRADEN**, *Judge.*

## I.   RELEVANT FACTUAL BACKGROUND.[1]

### A.   Plaintiff's Initial Employment With The United States Department Of The Navy.

In 1978, Roxann Franklin Mason was hired as a General Schedule ("GS") 5 employee in the United States Department of the Navy ("Navy"), as a Statistical Assistant in the Office of the Comptroller, Statistics Division of the Military Sealift Command ("MSC"). Am. Compl. ¶ 5. By 1987, she achieved the position of GS-12 Statistician. Am. Compl. ¶¶ 6–9.

In June 1987, a GM-13 Statistician position was advertised and Ms. Franklin Mason applied. Am. Compl. ¶ 11. On January 27, 1988, she was informed that the GM-13 Statistician position was cancelled and that Donald Petska, a white male, was being transferred from the Budget Division into the Statistics Division to fill that position, without competition.[2] Am. Compl. ¶ 13.

### B.   Plaintiff's Title VII Claim Before the Equal Employment Opportunity Commission.

In 1988, Ms. Franklin Mason filed a Title VII claim with the Equal Employment Opportunity Commission ("EEOC"). Am. Compl. ¶¶ 14, 31. On August 10, 1989, she tendered her resignation that was considered a constructive termination. Am. Compl. ¶ 30.

In August 1995, the EEOC convened hearings on the Title VII claim. Am. Compl. ¶ 31. On July 3, 1996, the Administrative Law Judge ("ALJ") issued a post-hearing decision in favor of Ms. Franklin Mason. Am. Compl. ¶ 31. On September 6, 1996, the Navy rejected the ALJ's findings of discrimination and issued a Final Agency Decision, determining that Ms. Franklin Mason failed to establish a *prima facie* case of discrimination. Am. Compl. ¶ 34.

---

[1] The relevant facts were derived from: Plaintiff's March 9, 2015 Amended Complaint ("Am. Compl."); Plaintiff's June 18, 2015 Motion For Summary Judgment ("Pl. Mot."); the Government's September 18, 2015 Cross-Motion For Summary Judgment ("Gov't SJ") And Response To Plaintiff's June 18, 2015 Motion For Summary Judgment ("Gov't Opp.") and the Government's October 6, 2015 Corrected Appendix ("Gov't App. A1–578"); Plaintiff's January 13, 2016 Corrected Opposition To The Government's Cross-Motion And Reply Memorandum ("Pl. Opp. & Reply") together with an attached Appendix ("RFM 1–1620"); and the Government's January 14, 2016 Reply ("Gov't Reply").

[2] The March 9, 2015 Second Amended Complaint alleges that Donald Petska had substantially less experience and training than Ms. Franklin Mason. Am. Compl. ¶ 13.

### C.   Plaintiff's Complaint In The United States District Court For The District Of Columbia And Stipulation Of Settlement And Order.

On October 31, 1996, Ms. Franklin Mason ("Plaintiff") filed a Complaint in the United States District Court for the District of Columbia ("District Court") against the Navy for violating Title VII.  Am. Compl. ¶ 34.

On April 7, 1999, a Stipulation of Settlement ("Settlement Agreement") was filed with the District Court requiring the Navy to pay $400,000 to Plaintiff as back pay.  RFM 1.  In addition:

- Paragraph 2 of the Settlement Agreement required the Navy to reinstate Plaintiff's employment with the MSC and to appoint Plaintiff as "Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC."  RFM 1.

- Paragraph 6 of the Settlement Agreement required the Navy to "make a thrift savings account[3] available to Plaintiff."  RFM 2.  $36,000 of the back pay award was to be deducted and allocated to the thrift savings account.  RFM 2.

- Paragraph 9 of the Settlement Agreement required the Navy "to provide Plaintiff with orientation and other related activities to assist her in carrying out the duties and responsibilities of the position."  RFM 3.  Paragraph 9 also required the Navy to consider Plaintiff "for any and all educational benefits afforded to personnel employed at her grade/level."  RFM 3.

- Paragraph 10 of the Settlement Agreement prohibited the Navy from requiring Plaintiff "to work directly for or be supervised by William Savitsky, Robert Hoffman, or Donald Petska in the normal course of her duties."  RFM 3.  Paragraph 10 also prohibited "these individuals [and] any other personnel in the Office of the Comptroller [from being] involved in any way with the formal evaluation of Plaintiff's work performance or in decisions made regarding Plaintiff's employment status."  RFM 3.

- Paragraph 11 required that "Plaintiff's resignation of employment effective August 11, 1989 . . . be rescinded."  Paragraph 11 also required the Navy, within 60 days, to expunge from Plaintiff's records, "any information and/or reference to the notice of proposed removal issued to Plaintiff, all medical records associated with the proposed removal, as well as the AWOL [Absent Without Official Leave] status and LWOP [Leave Without Pay] status for the time period of February 28, 1988 to June 6, 1988."  RFM 3.

---

[3] "The Thrift Savings Plan is a retirement savings plan for federal employees 'similar to 401(k) plans offered to private sector employees.'"  Gov't Opp. at 19 (quoting *Summary of the Thrift Savings Plan* 3, TSP.GOV, https://www.tsp.gov/PDF/formspubs/tspbk08.pdf).

- Paragraph 16 provided that the Settlement Agreement "contain[ed] the entire agreement between the parties and supersed[ed] any and all previous agreements, whether written or oral, between the parties relating to this subject matter." RFM 4.

On April 15, 1999, the District Court approved and entered the Stipulation of Settlement And Order.  RFM 14.

### D.      Plaintiff's Post-April 1999 Employment With The Navy.

In April 1999, Plaintiff also returned to work as a GS-13, Step 10 Senior Financial Analyst/Advisor to the NFAF's Financial Manager.  Am. Compl. ¶ 59.  On December 10, 1999, Plaintiff filed an Emergency Motion to enforce the terms of the April 15, 1999 Settlement Agreement. Am. Compl. ¶ 90.  On May 12, 2000, the District Court denied the Emergency Motion and ordered the parties to resolve the implementation of the Final Order.  Am. Compl. ¶ 90.

On May 7, 2001, Plaintiff filed a second Motion For Order To Enforce The Final Order. Am. Compl. ¶ 91.  On October 24, 2001, the District Court denied Plaintiff's May 7, 2001 Motion. Am. Compl. at ¶ 91.  On November 9, 2001, Plaintiff filed a third Motion To Enforce The Final Order And For Sanctions.  Am. Compl. ¶ 91.

On July 8, 2002, the assigned United States District Court Judge recused himself from further proceedings and the case was reassigned. Am. Compl. ¶ 93.  On January 30, 2003, the case was referred to a United States District Court Magistrate Judge.  Am. Compl. ¶ 93.

On September 9, 2003, the Magistrate Judge issued a Preliminary Report And Recommendation denying the alleged violations of Settlement Agreement Paragraphs 6 (requiring the Navy to establish a thrift savings account available to Plaintiff) and 9 (requiring the Navy to provide Plaintiff with orientation and activities to assist with her job responsibilities). Gov't App. A286, 293. The Magistrate Judge also determined that "[a]n evidentiary hearing in this matter is necessary to resolve . . . claims regarding paragraphs 2 and 10 [of the Settlement Agreement]. I will, therefore, issue a separate Order setting such a hearing."  Gov't App. A293.

In June 2004, Plaintiff again resigned from the Navy.[4]  Am. Compl. ¶ 94.

On February 2–5, 2005 and April 8, 2005, the Magistrate Judge convened evidentiary hearings.  RFM 21.

On March 21, 2006, the Magistrate Judge issued a Report And Recommendation on Plaintiff's November 9, 2001 Motion To Enforce the Final Order And For Sanctions.  Am. Compl. ¶ 95.

---

[4] The March 9, 2015 Amended Complaint alleged that Plaintiff's second resignation was considered a constructive discharge.  Am. Compl. ¶ 94.

On May 22, 2009, the District Court issued a Memorandum Opinion Transferring Plaintiff's Motion To Enforce The Settlement Agreement To The United States Court Of Federal Claims. *See Franklin-Mason v. Penn*, 616 F. Supp. 2d 97, 99 (D.D.C. 2009) ("Because this court lacks jurisdiction over Franklin–Mason's claim to enforce the settlement agreement, her motion to enforce the settlement agreement will be transferred to the United States Court of Federal Claims.").

## II.   PROCEDURAL HISTORY.

### A.   Proceedings Before The United States Court Of Federal Claims During 2009–2010.

On September 29, 2009, the case was transferred to the United States Court of Federal Claims.  On October 27, 2009, Plaintiff filed a Transfer Complaint.

On February 26, 2010, the Government filed a Motion To Dismiss.  On March 25, 2010, Plaintiff filed a Reply Opposing Defendant's Motion To Dismiss And, In The Alternative, Remand Back To The United States District Court For The District Of Columbia.  On April 13, 2010, the Government filed a Reply.

On July 23, 2010, the court issued a Memorandum Opinion And Final Order Transferring Case To The United States District Court For The District Of Columbia.  *See Franklin-Mason v. United States*, No. 09-640 at *7 (July 23, 2010) ("[T]he Clerk of the United States of Federal Claims is directed to transfer this case to the United States District Court for the District of Columbia.").

### B.   Proceedings Before The District Court And The United States Court Of Appeals For The District Of Columbia During 2010–2014.

On September 16, 2010, the case was transferred from the United States Court of Federal Claims back to the District Court.  RFM 26.

On January 27, 2012, the District Court issued a Final Order, dismissing Plaintiff's Title VII discrimination claims and denied Plaintiff's Motion To Enforce The Settlement Agreement. RFM 26.  Plaintiff appealed.

On February 14, 2014, the United States Court of Appeals for the District of Columbia issued an Opinion, affirming the District Court's decision and holding that the United States Court of Federal Claims has exclusive jurisdiction over the case.  *See Franklin-Mason v. Mabus*, 742 F.3d 1051, 1058 (D.C. Cir. 2014) ("We conclude [that] the [United States] Court of Federal Claims has jurisdiction over Franklin–Mason's [M]otion [T]o [E]nforce[.]").  The United States Court of Appeals for the District of Columbia remanded the case to the D.C. District Court with "instructions to transfer [the case] to the [United States] Court of Federal Claims." *Id.*

C.      **Proceedings Before The United States Court Of Federal Claims From 2014–Present.**

On October 2, 2014, the case was transferred back to the United States Court of Federal Claims.

On March 9, 2015, Plaintiff filed an Amended Complaint.  On April 27, 2015, the Government filed an Answer.  On June 18, 2015, Plaintiff filed a Motion For Summary Judgment.  On September 18, 2015, the Government filed a Cross-Motion For Summary Judgment And Response To Plaintiff's June 18, 2015 Motion For Summary Judgment.  On November 24, 2015, Plaintiff filed an Opposition To The Government's Cross-Motion For Summary Judgment And Reply Memorandum.

On January 13, 2016, Plaintiff filed a Consent Motion To Amend/Correct Response To Cross Motion and attached a corrected Opposition.  That same day, the court granted Plaintiff's Consent Motion.  On January 14, 2016, the Government filed a Reply.

## III.   DISCUSSION.

A.      **Jurisdiction.**

1.      **The Government's Argument.**

The Government argues that the United States Court of Federal Claims does not have jurisdiction over the March 9, 2015 Amended Complaint, because Plaintiff was constructively discharged from the Navy in 2004.  Gov't Reply at 6.  "If [Plaintiff] believed that her retirement was involuntary, she could have appealed with the MSPB [United States Merit Systems Protection Board]."  Gov't Reply at 6.  "Because the issue of an involuntary retirement is within the MSPB's jurisdiction, this [c]ourt does not have jurisdiction over that issue."  Gov't Reply at 7 (citing *Pueschel v. United States*, 297 F.3d 1371, 1378 (Fed. Cir. 2002) ("[T]he [United States] Court of Federal Claims does not have jurisdiction over a case that could be heard by the MSPB.").

2.      **Plaintiff's Response.**

Plaintiff did not respond.

3.      **The Court's Resolution.**

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . .  [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *Testan*, 424 U.S. at 400. And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

The March 9, 2015 Amended Complaint does not include a claim for constructive discharge, but alleges a breach of the Settlement Agreement and breach of the duty of good faith and fair dealing. "Tucker Act jurisdiction may be exercised in a suit alleging breach of a Title VII settlement agreement[.]" *Holmes v. United States*, 657 F.3d 1303, 1312 (Fed. Cir. 2011). In addition, the March 9, 2015 Amended Complaint alleges misrepresentation in the inducement. Am. Compl. ¶ 119. The United States Claims Court has held that "a tortious breach of contract styled as a misrepresentation in the *inducement* . . . does *not* fall outside of this court's Tucker Act jurisdiction." *Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503, 526 (1986) (emphasis added). As such, the court has jurisdiction over the claims alleged in the March 9, 2015 Amended Complaint.

### B.     Plaintiff's June 18, 2015 Motion For Summary Judgment.

#### 1.     Whether The Navy Breached The Settlement Agreement.

##### a.     Plaintiff's Argument.

Plaintiff argues that the Navy breached the Settlement Agreement in five ways: (1) by failing to appoint her as "Senior Financial Analyst/Advisor to the *Financial Manager* of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC," Pl. Mot. at 25 (emphasis added); (2) by failing to expunge her Official Personnel File ("OPF") within 60 days of the Settlement Agreement, because the Navy lost her OPF and had to reconstruct it; (3) by allocating a retirement contribution into the G Thrift Savings Fund rather than the C fund; (4) by failing to provide Plaintiff with educational and training opportunities; and (5) by requiring Plaintiff to interact with the Comptroller Office. Pl. Mot. at 23–33.

First, Plaintiff argues that Paragraph 2 of the Settlement Agreement required that Plaintiff be appointed as "Senior Financial Analyst/Advisor to the *Financial Manager* of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC." Pl. Mot. at 25 (citing RFM 1) (emphasis

added).  But, the Navy never hired a Financial Manager.  Pl. Mot. at 25.  Because there was no Financial Manager, Plaintiff worked for a Deputy Program Manager.  Pl. Mot. at 25.  "[A]bsolutely nothing in the Settlement Agreement stat[ed] that [Plaintiff] would be the Senior Financial Analyst/Advisor *to the Deputy Program Manager*[.]"  Pl. Mot. at 25 (emphasis in original).  As such, "the Navy breached the plain language of the agreement when it failed to place a Financial Manager in which she was to report."  Pl. Mot. at 26.

Second, Plaintiff asserts that the Navy lost her personnel file and had to "reconstruct" it. Pl. Opp. & Reply at 16 (citing RFM 1614) (1/26/15 e-mail from Assistant United States Attorney Fred E. Haynes to Plaintiff's attorney) ("I am pretty sure that we have her reconstructed OPF[.]"); *see also* RFM 1616 (7/13/00 e-mail from Government personnel to Plaintiff) ("I had gotten what I could find in the files . . . and had sent that to HRSC-Cap to start reconstruction of an OPF for you.")).  "[T]he Navy has not and indeed cannot verify that . . . Mrs. Franklin Mason's OPF was expunged with[in] 60 days of Judge Sullivan's approval, *if ever*."  Pl. Opp. & Reply at 35.

Third, Plaintiff contends that "[t]he Navy breached ¶ 6 of the [Settlement Agreement] by causing a contribution to be made in the 'G' Thrift Savings Fund, not the 'C' fund, and as directed by [Plaintiff]."  Pl. Mot. at 31.  During settlement negotiations, Plaintiff and her counsel "*insisted* that [Plaintiff] had a right to make an allocation of her choosing . . . and the Navy could not require that she waive that right."  Pl. Opp. & Reply at 33 (emphasis in original).  Plaintiff, on an April 19, 1999 TSP form, allocated 10% of her retirement contribution to the G Fund and 90% to the C Fund.  RFM 39.  The Navy, however, allocated 100% to the G Fund.  Pl. Opp. & Reply at 16.

Fourth, Plaintiff argues that the Navy breached Paragraph 9 of the Settlement Agreement by failing to provide her with adequate educational and training opportunities.  Pl. Mot. at 31.  The purpose of including education and training in the Settlement Agreement was "to resume Mrs. Franklin Mason's professional progression as close to Donald Petska, who had received a Masters degree paid for by the Navy.  The Navy consistently refused to offer her education opportunities similar [to] that [of] her comparator" and denied training requests.  Pl. Opp. & Reply at 36 (citing RFM 1545–46).

Fifth, Plaintiff argues that the Navy breached the Settlement Agreement by requiring her to interact with the Comptroller's Office.  Pl. Mot. at 28.  Specifically, one of Plaintiff's supervisors, Captain Larry Penix stated that feedback from Comptroller staff may have been reflected in Plaintiff's performance evaluation.  Pl. Opp. & Reply at 14 (citing RFM 611) (2/4/05 Penix Cross-Examination[5]) ("A.  Well, if there was a project that [Plaintiff] was working on with N8[6] [and she gave it to N8 and N8 said, gee, that was a great job, I would consider that as much as if they would have said, hey, we got this late, can you speed it up[.]"))  Plaintiff also contends that, in June 2001, the Navy was re-organized, so that "all [500 series] personnel handling funds or budgets, like Mrs. Franklin Mason, were to report to the Comptroller."  Pl. Opp. & Reply at 17

---

[5] Direct and Cross Examinations referenced herein refer to the evidentiary hearings before the Magistrate Judge that took place in Washington, D.C. on February 2–5, 2005 and April 8, 2005.

[6] N8 refers to the Office of the Comptroller.  RFM 1336.

(citing RFM 170) (2/2/05 Plaintiff Direct Examination) ("A. There was an e-mail . . . [and] the gist of it was that everyone under the 500 series must report directly to the Office of the Comptroller. . . . It meant that I reported to the Office of the Comptroller.")). Although Mr. Barry Nelson, the head of PM-1 at the time, advised Plaintiff that she was exempt from the re-organization, RFM 192, there is no evidence that a Navy official who had the authority to exempt Plaintiff actually made that decision. Pl. Opp. & Reply at 17–18 (citing RFM 194–95) (2/2/05 Plaintiff Direct Examination) ("A. No. I didn't receive anything that told me in writing that I was exempt from working directly for the Office of the Comptroller.")). As such, the Navy breached the Settlement Agreement by requiring Plaintiff to work for the Comptroller and using feedback from the Comptroller in Plaintiff's performance evaluations. Pl. Opp. & Reply at 17–18, 28.

### b.      The Government's Opposition.

The Government counters that the Navy was unable to hire a Financial Manager, because MSC never approved Mr. Nelson's request for one. Gov't Opp. at 16 (citing Gov't App. A123–29) (4/14/04 Nelson Dep.). In any event, the Navy's inability to hire a Financial Manager was not a material breach of the Settlement Agreement, because the Navy substantially complied with its duties there. Gov't Opp. at 17. In addition, the Navy provided Plaintiff with supervisors with financial backgrounds: Captain Penix has a B.S in Business Administration and his job duties included reviewing budgets; Captain Michael Herb has a background in financial analysis, management, and performed budget and financial analyst work; Mr. Nelson was responsible for administering a $1.2 billion budget. Gov't Opp. at 18 (citing Gov't App. A93–94) (4/6/04 Penix Dep.); Gov't App. A100–06 (4/7/04 Herb Dep.); Gov't App. A217–19 (2/2/05 Craig Direct Examination). "Moreover, [Plaintiff] was reporting to . . . individuals who were more senior and who carried more responsibilities than any individual who might fill the financial manager position." Gov't Opp. at 19.

The Government also insists that the Navy properly expunged Plaintiff's OPF. Gov't Opp. at 32. In accordance with Paragraph 11 of the Settlement Agreement, Plaintiff's OPF "does not contain 'any information and/or reference to the notice of proposed removal to [her], [any] medical records associated with the proposed removal, [or] the AWOL status and LWOP status for the time period of February 28, 1988 to June 6, 1988.'" Gov't Opp. at 32 (citing Gov't App. A3) (Settlement Agreement Paragraph 11); and Gov't App. A418–578 (Plaintiff's OPF). In addition, at the February 4, 2005 Evidentiary Hearing convened in Washington, D.C. before the Magistrate Judge, Gabriela Weimann, an employee in the Navy Human Resources Office, testified that Plaintiff's OPF did not contain any adverse information about Plaintiff's departure from MSC. Gov't Opp. at 33 (citing Gov't App. A230–31) (2/4/05 Weiman Direct Examination); *see also* RFM 532–34 (same). Moreover, contrary to Plaintiff's argument that the Navy lost and reconstructed her OPF, the Director of the Department of the Navy Office of Civilian Human Resources, Operations Center-Norfolk submitted a signed affidavit stating that Plaintiff's OPF "appears to be an original OPF. There is no obvious indication that the file has been reconstructed and there is no form in the OPF that indicates that the filed reviewed has been reconstructed." Gov't App. A90.

Next, the Government points out that on February 15, 2000, the Navy provided a check for $36,000 to the Thrift Savings Plan ("TSP") Administrator along with a letter instructing "the TSP

to deposit the funds into Ms. Mason's TSP account in connection with a back pay award. . . . [O]n April 24, 2000, the TSP posted $36,000 to Ms. Mason's newly established TSP account." Gov't App. A394 (8/9/00 Letter from Patrick J. Forrest, Attorney for the Federal Retirement Thrift Investment Board, to Alexander Shoaibi, Assistant United States Attorney). Although Plaintiff argues that the Navy should have deposited the funds in the C Fund instead of the G Fund, the Navy's actions were appropriate, because the Settlement Agreement contains "*no* language regarding the type of fund into which the $36,000.00 was deemed to have been invested from January 1990 through April 11, 1999." Gov't Opp. at 21. Moreover, "at the time that the parties entered into the [S]ettlement [A]greement, an Office of Personnel Management ('OPM') regulation required that when . . . the Government places funds into a TSP upon an employee's return to duty, the money is deemed to have been invested in the G Fund in the period between the employee's departure from service and her return." Gov't Opp. at 21 (citing 5 C.F.R. § 1605.4 (1999)).[7] "[B]ecause the Navy fully complied with its obligations under the [S]ettlement [A]greement regarding [Plaintiff's] thrift savings account, and because an OPM regulation required the Navy to calculate lost earnings based upon the interest rates earned by the G Fund . . . the [c]ourt should grant summary judgment for [the Government] on this claim." Gov't Opp. at 23.

The Government also argues that Plaintiff failed to produce evidence to support the claim that the Navy did not provide her with adequate educational and training opportunities. Gov't Opp. at 23–24. The Navy met its affirmative obligations to provide training and education:

- Ms. Lucy Austin, the Business Manager for the NFAF Program Office, provided [Plaintiff] with orientation. Gov't App. A34.
- Ms. Austin also provided Plaintiff with oral briefings, an overview of the NFAF Program, financial briefs, financial reports, and the NFAF business plan. Gov't App. A34.
- Ms. Austin also scheduled a trip to San Diego for Plaintiff, so she could meet with the NFAF Program field office there. Gov't App. A34.
- Plaintiff also was afforded and took advantage of numerous professional development seminars such as attending the American Society of Military Comptrollers' Professional Development Institute and the NFAF Financial Management Conference. Gov't App. A34.
- Plaintiff also attended training courses and graduate-level university courses. Gov't App. A34–35.

As to the two times Plaintiff's requests were denied, "Captain Penix considered her requests, explained the reasons for denying her requests, and recommended that she take courses

---

[7] Plaintiff countered that 5 C.F.R. § 1605.4 was inapplicable, because this regulation established allocation procedures for the correction of administrative errors in calculating lost wages and other pay miscalculations. Pl. Reply at 34 (citing 5 C.F.R. § 1605; *see also Garcia v. United States*, 996 F. Supp. 39 (D.C. Cir. 1998)). "The Navy has cited no controlling authority for the premise that back-pay damages in a Title VII claim is a 'correction' of an administrative error[.]" Pl. Reply at 34. Therefore, 5 C.F.R. § 1605.4 is inapplicable. Pl. Reply at 34.

related to her job duties." Gov't Opp. at 25 (citing Gov't App. A401, 403). When Captain Herb became Plaintiff's supervisor, he "did not recall denying any of [Plaintiff's] requests for training." Gov't Opp. at 26 (citing Gov't App. A120). "Because [Plaintiff] attended or participated in orientation and numerous training activities related to her position and because her supervisors considered her for all of the training she requested—even if those requests were denied—the Navy fully complied with its obligations regarding training[.]" Gov't Opp. at 26.

Moreover, there is no evidence in the record that Plaintiff worked directly for or was directly supervised by Mr. Savitsky, Mr. Hoffman, or Mr. Petska. Gov't Opp. at 27 (citing Gov't App. A184) (2/2/05 Smith Direct Examination (former attorney for the MSC)) ("[Plaintiff] was assigned in PM-1, the Naval Fleet Auxiliary Force. She wasn't assigned in the Comptroller directorate. She didn't work for Mr. Savitsky. She didn't work for Mr. Hoffman, did not work for Mr. Petska."). Likewise, Plaintiff was never supervised by personnel in the Comptroller's Office. Instead, Captain Penix directly supervised Plaintiff "from the time she returned to the MSC in 1999 until Captain Penix left MSC in 2002, and then by Captain Herb from 2002 until [Plaintiff] left the MSC in 2004." Gov't Opp. at 27 (citing Gov't App. A37) (Penix Decl. ¶ 4); Gov't App. A48 (Herb Decl. ¶ 2). Plaintiff's second-line supervisor was Mr. Nelson (Gov't App. A99) and "[Plaintiff] has acknowledged that Mr. Nelson was the head of the NFAF and that he did not report to Mr. Savitsky, Mr. Hoffman, or Mr. Petska." Gov't Opp. at 27 (citing Gov't App. A167) (2/2/05 Plaintiff Direct Examination).

In fact, although the MSC was restructured in 2001, so that all individuals doing financial work were to report to the Comptroller (Gov't Opp. at 27) "Mr. Nelson and Mr. Savitsky agreed . . . that Plaintiff was exempt from this requirement." Gov't Opp. at 28 (citing Gov't App. A154–55) (4/14/04 Dep. of Barron Nelson). Indeed, there is no evidence that Mr. Savitsky, Mr. Hoffman, Mr. Petska, or any other Comptroller personnel were involved in evaluating Plaintiff's work performance or deciding her employment status. Gov't Opp. at 28. For example, "[Plaintiff's] performance evaluations do not contain signatures or any other indications that anyone from the Office of the Comptroller was involved in evaluating her work performance." Gov't Opp. at 28 (citing Gov't App. A75–78) (9/21/00 MSC Performance Plan And Appraisal Form For Plaintiff). "[Plaintiff] has even admitted that she does not know whether anyone from the Office of the Comptroller had ever had any involvement with the formal evaluation of her work performance." Gov't Opp. at 29 (citing Gov't App. A171) (2/2/05 Plaintiff Direct Examination) ("[Magistrate Judge]: But the point I'm trying to make, Ms. Franklin Mason, is, during this evaluation process . . . did the evaluation on its face indicate that the Comptroller's office has expressed some view of opinion in the manner in which you performed your duties? [Plaintiff]: I would have no way of knowing that.").

The Government adds that the court should disregard Plaintiff's argument that the Settlement Agreement prohibited *any* contact with *any* personnel from the Comptroller. Gov't Mot. at 30 (citing Pl. Mot. at 20–21). Specifically:

[t]he [S]ettlement [A]greement does not preclude [Plaintiff] from having any interaction whatsoever with Mr. Savitsky, Mr. Hoffman, Mr. Petska, or other personnel in the Office of the Comptroller; rather, the [S]ettlement [A]greement protected [Plaintiff] form 'working directly for or being supervised by' Mr.

Savitsky, Mr. Hoffman, and Mr. Petska, and prevented any personnel from the Office of the Comptroller to have any involvement with 'the formal evaluation . . . or in decisions made regarding [her] employment status.'

Gov't Opp. at 30–31 (quoting Gov't App. A3) (Paragraph 10 of the Settlement Agreement).

### c.   The Court's Resolution.

### i.  Standard Of Review For Summary Judgment.

On a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Amergen Energy Co. ex rel. Exelon Generation Co. v. United States*, 779 F.3d 1368, 1372 (Fed. Cir. 2015) (quoting Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC")) ("Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"). Only genuine disputes of material fact that might affect the outcome of the suit preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247–48 (emphasis in original). "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### ii. Whether The Navy Violated Paragraph 2 Of The Settlement Agreement By Failing To Appoint Plaintiff As "Senior Financial Analyst/Advisor To The Financial Manager."

As a threshold matter, there are no genuine disputes of material fact with respect to the Navy's Obligation under Paragraph 2 of the Settlement Agreement that "Plaintiff shall be appointed as a Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force (NFAF) Program (PM1) of the MSC." RFM 1.

As a matter of law, "[n]ot every departure from the literal terms of a contract is sufficient to be deemed a material breach of a contract requirement." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992). Whether a breach is material "depends on the nature and effect of the violation in light of how the particular contract was . . . bargained for[.]" *Id.* at 1551.

For these reasons, the court has determined that the Navy's failure to hire a Financial Manager was not a material breach of Paragraph 2 of the Settlement Agreement's requirement

since she performed comparable work for supervisors with financial backgrounds. Gov't App. A93–94, 100–06, 217–19.

### iii. Whether The Navy Violated Paragraph 11 Of The Settlement Agreement By Failing To Expunge Plaintiff's OPF.

The Navy was required to expunge "any information and/or reference to the notice of proposed removal issued to Plaintiff, all medical records associated with the proposed removal, as well as the AWOL status and LWOP status for the time period of February 28, 1988 to June 6, 1988." RFM 3. Plaintiff's OPF, however, does not contain any references to Plaintiff's proposed removal nor does it reference AWOL or LWOP status. Gov't App. A418–577 (Plaintiff's OPF). Plaintiff's OPF reflects only that Plaintiff worked at the Department of the Navy without interruption from September 25, 1978 to June 3, 2004. Gov't App. A431. Therefore, even if the Navy lost Plaintiff's OPF and then "reconstructed" it, this dispute is not material. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

For these reasons, the court has determined that the Navy did not violate Paragraph 11 of the Settlement Agreement.

### iv. Whether The Navy Violated Paragraph 6 Of The Settlement Agreement By Allocating 100% of Plaintiff's Thrift Savings Account Funds To The G Fund.

Paragraph 6 of the Settlement Agreement requires the Navy to "make a thrift savings account available to Plaintiff." RFM 2. The Navy provided Plaintiff with a thrift savings account as required by Paragraph 6. The Settlement Agreement, however, did not require the Navy to allocate the contributions to any particular Fund. Moreover, the Settlement Agreement includes a merger clause. RFM 4 ("This Stipulation of Settlement and Order contains the entire agreement between the parties and supersedes any and all previous agreements, whether written or oral, between the parties relating to this subject matter."). Therefore, Plaintiff's use of parol evidence to establish that the Settlement Agreement required the Navy to allocate contributions as Plaintiff desired is inadmissible. *See McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1999) ("[W]e conclude that the agreement was fully integrated. Consequently the parol evidence rule prohibits the use of extrinsic evidence to add to or to modify its terms.").

For these reasons, the court has determined that the Navy did not violate Paragraph 6 of the Settlement Agreement.

### v. Whether The Navy Violated Paragraph 9 Of The Settlement Agreement By Failing To Provide Plaintiff With Educational And Training Activities.

Paragraph 9 of the Settlement Agreement required the Navy "to provide Plaintiff with orientation and other related activities to assist her in carrying out the duties and responsibilities of the position." RFM 3. The record shows that the Navy provided Plaintiff with orientation as well as training opportunities. Gov't App. A33–35. But, the Settlement Agreement did not require the Navy to grant Plaintiff's every request for education and training. *See TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its "plain and ordinary" meaning and the court may not look to extrinsic evidence to interpret its provisions.").

For these reasons, the court has determined that the Navy did not violate Paragraph 9 of the Settlement Agreement.

### vi. Whether The Navy Violated Paragraph 10 Of The Settlement Agreement By Requiring Plaintiff To Interact With The Comptroller's Office Contrary To The Settlement Agreement.

Paragraph 10 of the Settlement Agreement provided that:

> Plaintiff shall not be required to work directly for or be supervised by William Savitsky, Robert Hoffman, or Donald Petska in the normal course of her duties. The [Navy] further agrees that none of these individuals or any other personnel in the Office of the Comptroller shall be involved in any way with the formal evaluation of Plaintiff's work performance or in decisions made regarding Plaintiff's employment status.

RFM 3.

The court interprets the plain language of this provision to mean that Plaintiff could *interact* with the Comptroller's Office and with Mr. Savitsky, Hoffman, and Petska. But, the Settlement Agreement prohibited these individuals, as well as Comptroller personnel, from participating in Plaintiff's formal evaluations or in decisions regarding her employment with the Navy. RFM 3.

At the February 4, 2005 hearing in Washington, D.C. before the Magistrate Judge, Captain Penix testified, "Well, if there was a project that [Plaintiff] was working on with N8 and she gave it to N8 and N8 said, gee, that was a great job, I would consider that as much as if they would have said, hey, we got this late, can you speed it up[.]" RFM 611. But, Captain Penix testified that he did not receive any direct input from the Comptroller's Office and that Plaintiff was not required to work directly for Mr. Savitsky, Hoffman, or Petska. RFM 563 (2/4/05 Penix Direct Examination). After Captain Penix left the Navy in 2002, Captain Herb was Plaintiff's supervisor. RFM 1378. Captain Herb testified that he did not ask for any direct input from the Comptroller's

office when evaluating Plaintiff's job performance. RFM 1437 (4/7/04 Herb Dep.). Although the Navy re-organized, so that financial employees like Plaintiff reported to the Comptroller's Office, nothing in the record evidenced that Mr. Savitsky, Hoffman, Petska, or anyone else in the Comptroller's Office participated in evaluating Plaintiff's job performance or decided her employment status.

For these reasons, the court has determined that the Navy did not violate Paragraph 10 of the Settlement Agreement.

### 2. Whether The Navy Breached The Duty Of Good Faith And Fair Dealing.

#### a. Plaintiff's Argument.

In the alternative, Plaintiff argues that the Navy breached the duty of good faith and fair dealing, because Plaintiff was never given the appropriate assignments and supervision for her position. Pl. Mot. at 27–28 (citing RFM 173–75). Despite the Settlement Agreement's requirement that Plaintiff work as a GS-13 Senior Financial Analyst/Advisor to the Financial Manager of the Naval Fleet Auxiliary Force Program (PM-1) of MSC, Plaintiff was not given substantive financial assignments. Pl. Opp. & Reply at 29. An example of a non-financial assignment Plaintiff was given "involved cutting and pasting historical information about Naval ships from a book for display, along-side the ship's photograph, in the lobby." Pl. Opp. at 19 (citing RFM 1410–13). In fact, "[Captain] Herb did not believe he could assign financial work to [Plaintiff] because it would require her to interact with the Comptroller's office[.]" Pl. Opp. & Reply at 19 (citing RFM 707) (2/4/05 Herb Cross-Examination) ("[I]n counsel with Ms. [Marva] Riley, [a Navy personnel official], we made as a concession that I could . . . come up with some work that was nonfinancial in nature."). "Throughout his supervision of [Plaintiff], [Captain] Herb gave her a total of three assignments, only one of which was refused." Pl. Opp. & Reply at 20 (citing RFM 1415) (4/7/04 Herb Dep.) ("I think those are the only three [assignments] that I can remember because she was on sick leave a pretty substantial amount during that time frame[.]").

The financial assignments that Plaintiff did receive were from the Comptroller's Office, in violation of the Settlement Agreement. Pl. Opp. & Reply at 12 (citing RFM 198) (2/2/05 Plaintiff Direct Examination) ("[Plaintiff]: It was [financial] work that came from the Office of the Comptroller and it was, you know, filtered down[.]"); RFM 200; RFM 1549 ("[Plaintiff]: There are assignments that come from the Office of the [C]omptroller that I am asked to do which is in violation of my [S]ettlement [A]greement[.]").

#### b. The Government's Opposition.

To the extent that the March 9, 2015 Amended Complaint alleges "that the Navy acted in bad faith by failing to assign her job duties and responsibilities consistent with her job title[,] . . . [h]er failure to clearly assert specific acts of alleged bad faith preclude a finding of summary judgment in her favor." Gov't Opp. at 43–44 (citing *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 325 (2003) (finding that the complaint "must allege facts which if proved would constitute malice or an intent to injure.")). Indeed, "Captain Herb tried to address [Plaintiff's] complaints

about not getting work . . . by giving her financial work." Gov't Opp. at 45 (citing Gov't App. A265–66) (2/4/05 Herb Direct Examination). And, "on various occasions, [Plaintiff] refused to sign a performance plan outlining financial job duties, complete financial assignments, or taking training to assist her in completing her job duties." Gov't Opp. at 45 (citing Gov't App. A268–71). The Magistrate Judge also "found that the Navy personnel tried to give her work consistent with her position description[.]" Gov't Opp. at 46 (citing Gov't App. A317) (Report And Recommendation, No. 96cv2505 (D.D.C. Mar. 21, 2006)). Moreover, Plaintiff's "supervisors struggled with giving her additional work[,] because she was on extended leave and working on a reduced work schedule . . . and did not foster positive relationships with her coworkers." Gov't Opp. at 44. Specifically, in 2001, Plaintiff was out of the office for most of August and September due to surgery. Gov't App. A40–41. In 2002, Plaintiff also was out of the office for a significant portion of January, February, and March, and all of April through October. Gov't Opp. at 44 (citing Gov't App. A79–80) (4/12/05 Wright Decl.)). Plaintiff's "work attendance limited the duties that her supervisors could assign to her." Gov't Opp. at 45.

Notwithstanding Plaintiff's absence, the Government argues that the Navy provided Plaintiff with numerous financial assignments commensurate with her job title. Gov't Opp. at 7. Plaintiff was asked "to perform analyses of ships' financial performance . . . as well as charts, graphs, and briefs for Mr. Nelson." Gov't Opp. at 7 (citing Gov't App. A254–55) (2/4/05 Austin Cross Examination)); *see also* RFM 644–45. If the Navy struggled to provide Plaintiff her desired assignments, it was because Plaintiff "was 'reluctant to interact with other members of the staff' and because she 'took a lot of time off,' which led [her supervisor, Captain Penix] to 'give [assignments] to other people to meet the deadlines.'" Gov't Opp. at 7 (quoting Gov't App. A39–40) (12/10/01 Penix Decl. ¶ 13)); Gov't App. A243 (2/4/05 Penix Direct Examination). In addition, the record does not support the claim that Plaintiff received financial assignments from the Comptroller's Office. Gov't Opp. at 47. "Such conclusory allegations and '[m]ere speculation on the part of the plaintiff [are] insufficient bas[es] to meet the rigorous test to establish bad faith.'" Gov't Opp.at 47 (quoting *J. Cooper & Assocs., Inc. v. United States*, 53 Fed. Cl. 8, 25 (2002)).

In sum, "the evidence shows that, although [Plaintiff] was dissatisfied with her job, Navy personnel acted in good faith and consistent with the [S]ettlement [A]greement[.]" Gov't Opp. at 46.

### c.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has held that a breach of the duty of good faith and fair dealing does not require a plaintiff to prove specific targeting or specific bad intent. *See Metcalf Const. Co.*, *Inc. v. United States*, 742 F.3d 984, 993 ("[S]pecific targeting is not a general requirement."). But, "[t]he implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that . . . are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Id*. at 991. The record shows that Plaintiff received financial and non-financial assignments. Gov't App. A254–55 (2/4/05 Austin Cross Examination); *see also* RFM 198, 644–45, 1410–13. Although Plaintiff may have been unhappy with some of the assignments she received, the Settlement Agreement does not require job satisfaction. The record also shows that Plaintiff's supervisor, Captain Herb, was responsive to Plaintiff's concerns and developed a performance plan with financial management

assignments for Plaintiff. Gov't App. A264–71. Plaintiff, however, refused to contribute any input to the performance plan and she refused to sign the plan. Gov't App. A271. As such, the record demonstrates that the Navy acted in good faith to provide Plaintiff assignments commensurate with her position.

For these reasons, the court has determined that the Navy did not breach the duty of good faith and fair dealing.

### 3. Whether The Navy Committed Misrepresentation In The Inducement.

#### a. Plaintiff's Argument.

In the alternative, Plaintiff also argues that

the Navy's assurances about the GS-15 Financial Manager and the creation of the Financial Management office, [and] its promise of an imminent promotional opportunity were persuasive, and [Plaintiff] reasonably relied on these material representations given that the agreement was not only being reduced to writing, but was subject to Judge Sullivan's review.

Pl. Mot. at 30.

Specifically, in March 1999, Plaintiff attended a meeting with her husband, Douglas Mason; her counsel at the time, Abbey Hairston; the Program Manager of PM1, Barron Nelson; the Deputy Program Manager, Captain Larry Penix; and the Navy's counsel, Greg Smith. Pl. Mot. at 9; *see also* RFM 135, 144. On this occasion, she was advised she would work at a "Financial Office" separate from the Comptroller's Office and that Armand Ridolfi would be her supervisor. Pl. Opp. & Reply at 7–8 (citing RFM 150) (2/2/05 Plaintiff Direct Examination). Nevertheless, Navy officials "knew in January 1999 *before* Plaintiff entered into the Settlement Agreement with the Navy, "that there . . . *would never* be a 'Financial Office,' . . . , or 'financial manager' and that Ridolfi had never even been hired as represented." Pl. Opp. & Reply at 8 (citing RFM 302) (2/2/05 Smith Direct Examination) ("[Magistrate Judge]: Counsel's point is, on the day of the settlement agreement . . . there was no such human being occupying that position and her question is. Did you not, therefore, offer her a, as she put it, a position that did not exist in the same sense that if you appointed as assistant to the chief judge and there was not a chief judge. I'm getting a job [that] doesn't exist until they appoint a chief judge. [SMITH]: In that sense, yes."). This representation was critical, because "a reporting structure that would allow her to perform financial duties consistent with her experience and training without involvement from the Office of the Comptroller was *of the essence* for Mrs. Franklin Mason." Pl. Mot. at 26 (emphasis in original).

Navy officials also represented that there was a GS-14 financial manager position that had not been filled. Pl. Opp. & Reply at 9 (citing RFM 148) ("[Plaintiff:] [T]hat there was an opening, a vacancy for a financial manager, GS-14. Q. What did they tell you with respect to your ability to compete for that position? [Plaintiff:] They said that since I, obviously since I was GS-13 that, you know, I would be considered for that position.")). "[T]he representation was critical to [Plaintiff]

who believed that . . . there would be an *impending* advancement opportunity." Pl. Opp. & Reply at 9. Navy officials, however, only "intended to . . . bring [Plaintiff] 'back on the rolls and give[] [her] work to do.'" Pl. Opp. & Reply at 11 (citing RFM 303) ("[Greg Smith]. And she was brought back on the rolls and given work to do. She was paid.").

> **b.      The Government's September 18, 2015 Cross-Motion And Response To Plaintiff's Motion For Summary Judgment.**

The Government responds that "there is a dispute of material fact as to whether anyone made any misrepresentation to [Plaintiff] regarding whether Mr. Ridolfi had been hired to fill the GS-15 position, whether the GS-14 position was available, and whether a separate financial office had been created[.]" Gov't SJ at 50. Mr. Nelson testified that he did not tell Plaintiff that Mr. Ridolfi had been hired. Gov't SJ. at 50 (citing Gov't App. A220–21) (2/3/05 Nelson Direct Examination). Captain Penix and Mr. Smith also do not remember telling Plaintiff that Mr. Ridolfi had been hired. Gov't SJ. at 50 (citing Gov't App. A172–75) (2/2/05 Smith Direct Examination); Gov't App. A96 (4/6/04 Penix Dep.); Gov't App. A159 (11/9/04 Smith Dep.). They also testified that they did not tell Plaintiff that a GS-14 position was available. Gov't SJ. at 50 (citing Gov't App. A223) (2/3/05 Nelson Direct Examination); A245–46 (2/4/05 Penix Cross Examination); Gov't App. A139–40 (4/14/04 Nelson Dep.). In addition, Mr. Smith did not remember telling Plaintiff or Plaintiff's attorney that a separate financial office was being created. Gov't SJ. at 50–51 (citing Gov't App. A173–74) (2/2/05 Smith Direct Examination); Gov't App. A194–96 (2/3/05 Smith Direct Examination). Because there material facts are at issue, Plaintiff is not entitled to summary judgment on this issue. Gov't SJ. at 50.

Instead, the Government argues that it is entitled to summary judgment on misrepresentations, because the integration clause expressly states that the Settlement Agreement constitutes "the *entire agreement* between the parties and *supersedes any and all previous agreements, whether written or oral*[.]" Gov't SJ. at 51 (citing Gov't App. A4). The United States Court of Federal Claims has held that a plaintiff cannot prove justified reliance on a misrepresentation where a contract contains an integration clause. Gov't SJ. at 51 (citing *Morris v. United States*, 33 Fed. Cl. 733, 746 (1995) (determining that the plaintiff unjustifiably relied on oral representations when the contract specifically stated that "[n]o oral statements or representations' were a part of the contract); *see also Nematollahi v. United States*, 38 Fed. Cl. 224, 233 (1997) (determining that, when the contract stated "the parties would not be bound by any representations, oral or written, not contained in this contract," the plaintiff was not justified in reliance); *Detroit Hous. Corp. v. United States*, 55 Fed. Cl. 410, 416 (2003) (finding that "[p]laintiff was not justified in relying on any alleged representation[,] because they were not part of the contract.").

Even if the court determines that Plaintiff has established misrepresentation in the inducement, the appropriate remedy is not money damages. Gov't SJ. at 52. "A party who has been induced to enter into a contract by a material misrepresentation of fact has the option of either ratifying or avoiding the contract at his election." Gov't SJ. at 52 (quoting *Pac. Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 742 (Ct. Cl. 1974)). If Plaintiff rescinds the Settlement Agreement, then she would have to return all settlement proceeds. Gov't SJ. at 54 (citing Gov't App. A346) (*Franklin-Mason*, 742 F.3d at 1056 n.5)). But, even if Plaintiff was willing to rescind

the Settlement Agreement and return the settlement proceeds, it is too late.  Gov't SJ. at 54.  "By continuing to work for years after she discovered the alleged problems . . . , [Plaintiff] ratified the [S]ettlement [A]greement."  Gov't SJ. at 55.  "The option to avoid a contract for fraud or misrepresentation is lost if after acquiring knowledge thereof the injured party continues with performance.  He is deemed to have affirmed or ratified the voidable contract."  *Pac. Architects*, 491 F.2d at 742–43.

### c. The Court's Resolution.

The Government is correct that contested facts typically preclude summary judgment.  But as previously discussed, the disputed facts are not material to the outcome of this case.[8]  *See Anderson*, 477 U.S. at 248 ("As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

In the alternative, the Government's Cross Motion For Summary Judgment argues that any claim for misrepresentation in the inducement has been waived.  The RESTATEMENT (SECOND) OF CONTRACTS § 164 cmt. a (1981) ("RESTATEMENT") provides, as a matter of law, that a misrepresentation may void a contract if the following requirements are met:  "First, the misrepresentation must have been either fraudulent or material[9] . . . .  Second, the misrepresentation must have induced the recipient to make the contract. . . .  Third, the recipient must have been justified in relying on the misrepresentation."  RESTATEMENT § 164 cmt. a.  In this case, however,

---

[8] Specifically, the witnesses in this case disagree on whether a meeting happened prior to settlement and disagree on what was said during that meeting.  Specifically, in her February 2, 2005 testimony before the Magistrate Judge, Plaintiff stated that she attended a meeting prior to signing the Settlement Agreement.  RFM 142–43.  Plaintiff stated that the Navy personnel at the meeting—Greg Smith, Barron Nelson, and Larry Penix—promised that a new financial office would be created and that Armand Ridolfi would be her supervisor.  RFM 146–48.  Greg Smith, the MSC attorney at the time, testified that the meeting happened after the Settlement Agreement was signed.  RFM 283.  Greg Smith also testified that he did not recall saying that Armand Ridolfi would be her supervisor or that a separate financial office had been created.  RFM 286–87.  Moreover, at the February 3, 2005 evidentiary hearing, Barron Nelson, the then-program manager of the MSC, testified that he did not tell Plaintiff that Armand Ridolfi would be her supervisor.  RFM 497, 502.  He also testified that he did not tell Plaintiff that the financial manager position had been established.  RFM 505.  At the February 4, 2005 evidentiary hearing, Captain Penix testified that he did not remember the exact date of the meeting.  RFM 550.  He also testified that Plaintiff was not told that she would be made a manager.  RFM 551.  He also testified that no one told Plaintiff that Armand Ridolfi would be her supervisor.  RFM 556.

[9] "A representation need not be fraudulent in order to make a contract voidable under the rule stated in this Section. However, a non-fraudulent misrepresentation does not make the contract voidable unless it is material, while materiality is not essential in the case of a fraudulent misrepresentation."  RESTATEMENT § 164 cmt. b.

the alleged misrepresentation is not "material" nor supported by facts that rise to the level of "fraud."

If the meeting at issue happened after the Settlement Agreement was executed, then Plaintiff could not have been induced into signing the contract. But, assuming *arguendo* that a pre-settlement meeting occurred and the Navy made misrepresentations, Plaintiff would have known that the Navy's promises were not being honored when she returned to work in 1999. RFM 168–171. It is well-established that when a party discovers a breach, "[the] injured party may either cancel a contract based on a breach, or it may instead continue the contract[.]" *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360 (Fed. Cir. 2004). Although Plaintiff filed several Emergency Motions to enforce the Settlement Agreement, RFM 14–17, Plaintiff never repudiated it. *See Dow Chem. Co. v. United States*, 226 F.3d 1334, 1344 (Fed. Cir. 2000) ("Repudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party. . . . The injured party can choose between terminating the contract or continuing it.") (citations omitted). Nor did Plaintiff return the $400,000 in back pay received under the Settlement Agreement. Instead, Plaintiff kept the money and continued to work at the Navy for five years until 2004. Am. Compl. ¶ 94. "[B]y continuing to perform, [a party] waive[s] any claim with respect to a prior material breach or material misrepresentation." *Barron Bancshares, Inc.*, 366 F.3d at 1383 (Fed. Cir. 2004).

For these reasons, the court has determined that Plaintiff waived any claim for misrepresentation in the inducement.

## IV. CONCLUSION.

For the reasons discussed, the court **denies** Plaintiff's June 18, 2015 Motion For Summary Judgment and **grants** the Government's September 18, 2015 Cross-Motion For Summary Judgment. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**